## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ )<br>RAMONE E. VARGAS, )<br>RANDY FLAMBO, and )<br>GARRY CIVIL, individually and on )<br>Behalf of a class of similarly )<br>Situated individuals, )<br>　　　　　　Plaintiffs, )<br> )<br>v. )<br> )<br> )<br>SPIRIT DELIVERY & DISTRIBUTION )<br>SERVICES, INC., )<br>　　　　　　Defendant. )<br>_____ ) | Civil Action No. 13-12635-TSH |

## <u>MEMORANDUM OF DECISION AND ORDER</u>
March 24, 2017

**HILLMAN, D.J.**

### <u>Introduction</u>

Ramone E. Vargas ("Vargas"), Randy Flambo ("Flambo") and Gary Civil ("Civil" or

"Plaintiff") filed suit against Spirit Delivery & Distribution Services, Inc. ("Spirit" or

"Defendant") alleging claims for violation of the independent contractor provision of the

Massachusetts Wage Act, Mass.Gen.L. ch. 149, §148 (the "MWA"), unjust enrichment and

quantum meruit.  More specifically, Plaintiffs, who worked as a delivery drivers, allege that as a

result of unlawfully characterizing them as independent contractors rather than employees, Spirit

has deprived them of various rights and benefits to which they are entitled.  Plaintiffs further

alleges that as a result of mischaracterizing the nature of their employment, Spirit has made

illegal deductions from their wages and been unjustly enriched.  Plaintiffs sue on behalf of themselves and other similarly situated individuals. Spirit filed cross-claims against Vargas, Flambo and Civil for indemnification.[1]

This Memorandum of Decision and Order addresses Plaintiffs' Motion For Class Certification (Docket No. 59), Defendant's Motion for Summary Judgment (Docket No. 108), and Plaintiffs' Motion for Partial Summary Judgment (Docket No. 112)[2]. For the reasons set forth below,  the motion for class certification is *granted*; Defendants' motion for summary judgment is *granted*, in part, and *denied*, in part; and the motion for partial summary judgment filed by the surviving Plaintiff, Civil*, is denied.*

## The Parties' Cross-Motions For Summary Judgment

### Standard of Review

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). " 'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case.' " *Sensing v. Outback Steakhouse*

---

[1] By Order dated May 9, 2014 (Docket No. 52), I granted the Motion Of The Defendant, Spirit Delivery & Distribution Serv., Inc., For Leave To File A Third-Party Complaint (Docket No. 29) pursuant to which Spirit proposed to bring claims against third-party defendants, Vargas Trucking Services, Inc., Flambo Contracting, Inc., and Civil Delivery LLC.  Spirit was instructed to file the Third-Party Complaint, for which leave had been granted (*see* Docket Entry No. 52).  However, Spirit never filed its Third-Party Complaint and therefore, there are no third-party claims pending at this time. Given the lengthy delay, Spirit shall not file the Third-Party Complaint against the remaining proposed third-party defendant, Civil Delivery LLC, without further leave of Court.

[2] On August 17, 2016, Vargas and Spirit jointly filed a Stipulation of Dismissal With Prejudice (Docket No. 163) dismissing all of Vargas's claims against Spirit and Spirit's counterclaims against Vargas and any proposed third party claims against Vargas Trucking Services, Inc.  Likewise, on February 9, 2017, Flambo and Spirit jointly filed a Stipulation of Dismissal With Prejudice (Docket No.  183) dismissing all of Flambo's claims against Spirit and all of Spirit's counterclaims against Flambo and any proposed third-party claims against Flambo Contracting, Inc.

*of Florida, LLC*, 575 F.3d 145, 152 (1ˢᵗ Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1ˢᵗ Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing,* 575 F.3d at 153.  The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.,* at 152.  " 'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.' " *Id.* (citation to quoted case omitted).  " '[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." *Id.* (citation to quoted case omitted).  The nonmoving party cannot rely on "conclusory allegations" or "improbable inferences". *Id.*  (citation to quoted case omitted).  " 'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted). "Cross-motions for summary judgment require the district court to 'consider each motion separately, drawing all inferences in favor of each non-moving party in turn.' " *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1ˢᵗ Cir. 2014)(citation to quoted case omitted).

## Findings of Fact

Spirit is a property broker authorized by the U.S. Department of Transportation Federal Motor Carrier Safety Administration to perform services in instate commerce.  Spirit provides end-to-end supply chain logistics solutions for its customers.  Spirit advertises that it specializes

in appliance home delivery, furniture home delivery, and electronic home delivery. Spirit employs approximately forty (40) employees in Massachusetts who perform warehouse operations and clerical or managerial functions. However, Spirit does not transport, deliver, or install its customers' products. Instead, it contracts with motor carriers (also referred to herein as "contractors" or "deliverers") that provide trucks and labor necessary to effectuate endpoint deliveries for its customers.

In June 2011, prior to entering into a business relationship with Spirit, Civil formed Civil Delivery LLC ("Civil Delivery"). Civil is a fifty percent (50%) owner of Civil Delivery and a manager/member of the company.  Civil's wife, Maria Civil, owns the other fifty percent (50%) of the company.  Civil and/or his company performed work for Spirit from August 2012 to October 2012, five to six days per week, delivering and installing Macy's products. Spirit required Civil's company, Civil Delivery, to sign a Settlement Carrier Contract ("Carrier Contract"), which classified him as independent contractor, and mandated that he incorporate. In June 2012, Maria Civil signed a Carrier Contract with Spirit on behalf of Civil Delivery.  Civil operated multiple trucks, one of which he drove; he recruited and hired others to drive the other trucks operated by Civil Delivery.  Prior to contracting with Spirit, Civil Delivery contracted with Home Delivery Link, a competitor of Spirt, to provide transportation and delivery services. Prior to 2012, Home Delivery Link had a contract with Macy's to provide home delivery service. In 2012, Macy's changed service providers from Home Delivery Link to Spirit and at that time, Civil/Civil Delivery entered into a relationship with Spirit. During the time period that he worked for Spirit, Civil did not receive any wages, earnings, or other income from any entity other than Spirit.  Civil did not advertise his company, he had no website, and no business cards. Through 2014, Civil Delivery contracted with various companies to provide delivery services.

Those companies included Eletto Trucking, 3PD, New England Retailers Express, and Bob's Furniture.  Civil hire seven individual drivers or helpers and leased or purchased three trucks, which Civil Delivery operated simultaneously.

Delivery vehicles were either leased or owned by the contractors. Delivery vehicles were leased through agreements with third parties such as Penske, Ryder and Enterprise. Spirit would, at times, facilitate payment of the lease obligations to the third parties and deduct that amount from the contractors' checks.  If the drivers used trucks that they own, Spirit inspected each truck and enforced specifications such as size, color, and the age of the truck.  Many of the specifications were imposed by Spirit's customers who required the trucks used by the contractors to have a certain appearance, frequently requiring the drivers to stencil their logo (*e.g.,* Macy's or General Electric) on the truck trailer.  Civil's truck only had a Macy' logo; he could not put the logo of his own "company" on the truck. Spirit informed Civil that the truck that he owned did not meet its standards and prohibited him from using it. Specifically, Civil was told he could not use the truck because it was not in compliance with U.S. Department of Transportation regulatory standards.

Spirit's drivers regularly made deliveries five or six days per week. However, under the terms of the Carrier Contract, it was the drivers' companies, not the drivers themselves that were obligated to make the deliveries.  The Carrier Contract prohibited Spirit's drivers from using any vehicles identified therein to do delivery work for non-Spirit customers during the term of the agreement without obtaining Spirit's prior written consent.  Drivers could use vehicles not identified in the Carrier Contract to do other work. Additionally, Drivers could not use equipment identified in the Carrier Contract which they purchased or leased to make deliveries

for Spirit customers, when making deliveries for non-Spirit customers without Spirit's prior written consent.

The terms of the Carrier Contract allowed Spirit to terminate contractors and cease assigning them deliveries if they failed to comply with "performance metrics" imposed by it, or if they utilized the services of any brokers or subcontracted delivery of any freight without its prior written consent.  Moreover, the Carriers Contract required the contractors to: (1) transport all shipments without delay-- any occurrence which caused a delay, or was likely to cause a delay had to be immediately communicated to Spirit; (2) obtain a receipt showing the kind and quantity of product delivered to customer at its intended destination (the receipt was required to be signed by the customer); (3) notify Spirit "immediately of any exception made on the bill of lading, cargo manifest or delivery receipt"; and (4) retain all documents relevant to the delivery of product for three years. The Carrier Contract gave Spirit the right to disqualify any helper or driver provided by the contractor for a variety of specified reasons, including in the event Spirit found such driver/helper to be unsafe, disqualified, or unfit. The Carrier Contract also gave Spirit the right to determine all rates and handle all billing of freight charges to the customer and the right to charge contractors for such things as freight damage or delay.[3]

---

[3] At his point, it would be helpful to reiterate that Spirit required drivers, such as Civil, to incorporate. Because it is the corporation that signs the Carrier Contract, Spirit asserts throughout its submissions that the obligations imposed on a contractor or deliverer by the terms of the Carrier Contract are technically imposed on the corporation.  Civil argues, essentially, that he and other similarly situated workers are the actual parties to the Carrier Contract and that Spirit requires them to create corporations to sign the agreement in order to avoid its legal obligation to provide them wages, benefits, etc. in accordance with the MWA.  As pointed out by Civil, "it is clear from the plain meaning of [the MDA], the Attorney General Advisory, and applicable case law, that in individual can bring a claim under [the MWA] even if he has incorporated his business and his putative employer's formal relationship is with the corporate entity." *Martins v. 3PD, Inc.*, Civ. Act. No. 11-11313-DPW, 2013 WL 1320454, at **7, 17 (Mar. 28, 2103); *see also Anderson v. Homedeliveryamerica.com, Inc.*, Civ.Act.No. 11-10313-GAO, 2013 WL 6860745 *3 (Dec. 30, 2013)(same).   Spirit's contention throughout its submissions that for purposes of this action it has no legal relationship with Civil-- only his company (Civil Delivery) is, therefore, incorrect as a matter of law.

Spirit undertook various obligations in its customer contracts, and imposed these requirements on the contractors. For example, Spirit had the right to require contractors to wear and purchase uniforms bearing the logo of Spirit's retailer clients, such as Macy's or General Electric when required by Spirit's contract with such customers. Spirit's contract with Macy's required drivers/contractors to wear "booties" over their feet, take time to impress the customer, and vacuum under all furniture and bedding.

There is a dispute between the parties as to the control Spirit maintained over contractors' daily activities and delivery schedules. Spirit's customers had various requirements related to the delivery times for their merchandise, including restrictions on how early in the morning a delivery could occur.  Among the disputed issues are whether Spirit dictated the specific routes contractors followed to make their deliveries each day (Civil's version), or whether the contractors advised Spirit in advance of the time they wish to begin their routes. For example, according to Spirit a driver, like Civil, would advise it on Tuesday morning of his desired start time and sequence of deliveries for the following Wednesday-- it did not require Civil to report to the requisite facility at a specific time. However, drivers generally reported to their assigned warehouses by 5:00 or 5:30 a.m. to complete a daily delivery schedule that often took them into the evening hours.

All drivers were assigned I.D. numbers and required to undergo background checks before working with Spirit.  There are occasions when Spirit refused to hire drivers based on the result of the background check. Spirit held meetings with drivers at which Spirit informed them: " 'Make sure you take care of the customer. Make sure you're in on time. Make sure you call the customer in advance before you arrive to the house.' Just make sure you did what you're supposed to do to take care of the customer."   Spirit management had daily telephone

discussions with upper management in New Jersey about transportation of the clients' goods.  A typical conversation would discuss, for instance, the: "load-out, how the contractors loaded, how were they gone, was there any stuff left on the dock, you know, any what we call overloads, and if we had any complaints from the day before, that I address them, from customers complaining about any contractor who might have, you know, had a bad experience with a customer." At the same time, Spirit alleges that the contractors determined how their trucks were loaded.

Spirit would receive daily reports from some of its customers about late deliveries from the day before which it would then address with the drivers. They would get a report every morning of what trucks ran late, how many late stops they had to customers. Drivers were reminded every morning that if they were going to run late, they had to call dispatch so that dispatch could call the customer and let them know the delivery would be late.  Some of Spirit's customers required drivers to use tablets on which they could input different information required by the customer, such as, their arrival at each stop, and the time that each job is completed. Such information permitted the driver's activities to be tracked in "real time" and allowed Spirit to notify the customer of any problems. A Spirit Manager, Robert Dionne ("Dionne"), explained as follows:

> They had Galaxy tablets. I think they're 10 inches. That's all they are. And it will have the drivers manifest in the morning on it. That's the manifest, Stop 1 to maybe, you know, Stop 14, customer's name, address, phone number, merchandise they're going to receive. And once the driver gets to their residence, he hits it, it will say 'Arrive,' he hits 'Arrive.' ... [And] when they were done with the delivery, they would hit 'Submit,' and it would tell the time they left the house....GPS is built into the tablet, and that would take them only from stop to stop. The driver never had to put a stop in there; the stop was already in there. So if he hit Stop 1 and he hit Stop No. 2, there's a little map at the bottom. You hit the map, and that would automatically take him from Stop 1 to Stop 2....We have a screen on the computer [at the office in Dedham], and it's called the service desk, and you can bring up every route that's out for the day, and every driver has a route number every day. You hit that route number, it tells you all the customers' names, the sales check number, the time the delivery should be there

8

within a two-hour window, like 7:00 to 9:00, 9:00 to 11:00.... [When the driver] hits 'Arrive,' it will put the time that he arrived at that stop. When he hits 'Depart,' it will say departed. Then it will show his next stop; ETA to next stop will be so and so....So we could track that just in case the driver's running late. We could be proactive, we could call dispatch and call the customer and let them know the driver could be running late.

Spirit also tracked "real time" GPS data to see where the driver is located. Dionne explained the reason for doing so:

> ...GPS data, it gives you where the driver's driving his truck. So if he's going from Point A to Point B, you can see that the tablet is on. And if he goes off-route, you can see if he went off-route.  Because every morning we'll ask the driver, 'What time do you think you could be at your first stop?' They tell us what time they would be at their first stop. So we would look at the GPS in the morning, and you look and Truck 204 wasn't at his first stop at 8:00 to 10:00. You look at the GPS, and you see him at the Dedham location, and he went down the wrong way, he sat there for, like, 20 minutes, then you know he was down there having breakfast, then he went to the customer's home. You know, the thing with delivering furniture is you just want to, you know, make the customer happy every time. If you're running late, they'll go shop somewhere else....The requirement is that the tablet once you came into the location in Dedham, the tablet should be on, and once you finish your last stop, you can turn that tablet off.

The tablets and GPS information data referred to by Dionne were required by Macy's. Spirit would notify Macy's of any problems and Macy's would notify its customers.  Macy's, not Spirit, owned the system which was used to view contractors' progress on their routes.  Pursuant to Spirit's contract with Macy's, drivers had to call Spirit's dispatch if they were running late for a delivery.  A  Spirit manager estimated that Spirit drivers performing Macy's deliveries contact dispatch approximately thirty times per day. Spirit's customer Best Buy required drivers to call an 800 number to update the retailer and Spirit every two or three stops throughout the day in order to keep track of the driver's progress.  General Electric operated an application that contractors accessed via smart phone to update delivery information.

Spirit's customers maintained and operated their own customer satisfaction surveys.  For example, Macy's conducted customer satisfaction surveys which required drivers to ask

customers to take a phone survey about the driver's performance. Macy's also sent e-mails to customers asking the customers to grade the drivers' performances. Spirit did not communicate the response from any such surveys to the drivers.  Using the information provided by customers, Spirit's retailer client(s) maintained and accessed performance matrices for all drivers. Macy's used the performance matrices to determine whether the drivers would receive a bonus. Macy's, not Spirit, determined which drivers were eligible for a bonus. The applicable performance standards were set in the Carrier Contract. If a driver's performance fell below the standards set by one of Spirit's customers, a Spirit manager would meet with the contractor to address the driver's poor performance. Spirit had the power to terminate the driver if his performance did not improve.

Spirit compensated drivers on a per-stop basis, without regard to the content or quantity of the goods the driver delivered, with a minimum flat-rate paid on days where a driver has few stops scheduled.  Contractor compensation varied from customer to customer and by area. Compensation was agreed to in the Carrier Contract and could not be negotiated by drivers. Spirit made deductions from the contractors' checks for "customer disappoints" such as a driver's failing to make a delivery within the window of time that the customer was expecting delivery. In addition, if customers claimed that the drivers had caused damage to their merchandise or residences, Spirit communicated with the customer and determined whether the drivers were responsible for the damage.  The contractor had an opportunity to explain the circumstances surrounding the incidents of property damage. Spirit deducted money from the contractor's compensation to pay for the damages where it was shown that the contractor was responsible for the damage.

**Discussion**

Defendant's Motion For Summary Judgment: Whether Federal Law Preempts Civil's Claims;
Whether Civil's Equitable Claims are barred because he has an Adequate Remedy at Law

In Count I of the Amended Complaint, Civil asserts claims against Spirit under the

independent contractor provision[4] on the grounds that Spirit mischaracterized him as an

independent contractor rather than employee and in doing so, failed to pay him all wages and

grant him employment benefits to which he is entitled.  The independent contractor provision of

the MWA " ' establishes a standard to determine whether an individual performing services for

another shall be deemed an employee or independent contractor for purposes of [Massachusetts]

wage statutes.' … 'The purpose of the independent contractor statute is to protect workers by

classifying them as employees, and thereby grant them the benefits and rights of employment,

where the circumstances indicate they are, in fact, employees' " *Chambers v. RDI Logistics, Inc.*,

476 Mass. 95,100, 65 N.E.3d 1 (2016)(internal citations and citations to quoted cases omitted).

Under the MWA, workers are presumed to be employees unless the entity making use of those

workers' services (the putative employer) proves that they are independent contractors. *Id.* In

order to overcome the presumption, the employer must establish each and every prong of the

following three-prong test set forth in the independent contractor provision of the MWA:

> (1) The individual is free from control and direction in connection
> with the performance of the service, both under his contract for
> the performance of service and in fact; and
>
> (2) the service is performed outside of the usual course of business
> of the employer; and,

---

[4] For example, the MWA requires that employees receive prompt payment of all wages earned: "in no
event shall wages remain unpaid by an employer for more than six days from the termination of the pay period in
which such wages were earned by the employee." Mass.Gen.L. ch. 149, § 148. "The Massachusetts Supreme
Judicial Court has interpreted the statute as banning improper wage deductions, even where the employee has given
his or her assent." *DaSilva v. Border Transfer of MA, Inc.*, No. CV 16-11205-PBS, 2017 WL 58953, at *2, --
F.Supp.3d-- (D. Mass. Jan. 5, 2017).

> (3) the individual is customarily engaged in an independently established
> trade, occupation, profession or business of the same nature as that involving the
> service performed.

Mass.Gen.L. ch. 149, § 148B. The employer can treat the worker as an independent contractor *only* if it establishes all three prongs-- where the employer cannot do so, the worker must be treated as an employee. *See Chambers,* 476 Mass. At 100, 65 N.E.3d 1. Spirit asserts that it is entitled to summary judgment on Civil's claim that it violated the independent contractor provision of the MWA because the statutory scheme is preempted by the Federal Aviation Administration Authorization Act of 1994, 49 U.S. C. §14501 *et seq.* ("FAAAA").  Civil, on the other hand, asserts that he is entitled to summary judgment on his claim that Spirit violated the MWA because the independent contractor statutory scheme is not preempted by the FAAAA and because, as a matter of law, Spirit cannot satisfy the independent contractor provision's three prong test (and therefore, cannot rebut the presumption that he was an employee).

In Count II of the Amended Complaint, Civil asserts a claim against Spirit for unjust enrichment on the grounds that by treating him as an independent contractor, Spirit has forced him bear the costs and obligations which it otherwise would have had to bear, including payroll taxes, worker's compensation, and social security withholding.  In Count III of the Amended Complaint, Civil asserts a claim against Spirit for quantum meruit on the grounds that Spirit's mischaracterization of him as an independent contractor has deprived him of the fair value of his services, which he is entitled to recover. Spirit asserts that it is entitled to summary judgment on Civil's unjust enrichment claim because it is preempted by the FAAAA. In the alternative, Spirit asserts that it is entitled to summary judgment on this claim because he has an adequate remedy at law.  Spirit also asserts that it is entitled to summary judgment on Civil's claim for "quantum meruit" because "quantum meruit" is not a cause of action and he has an adequate remedy at law.

*Whether the MWA is preempted by FAAAA*

The FAAAA expressly preempts any state law related to a price, route, or service of any motor carrier or any motor private carrier, broker, or freight forwarder with respect to the transportation of property …   Congress copied the FAAAA preemption provision from the preemption clause of the Airline Deregulation Act of 1978 ("ADA"), 49 U.S.C. § 41713(b)(1). The ADA was part of a wave of federal deregulation and was based on Congress's determination that maximum reliance on competitive market forces would favor lower airline fares and better airline service. The purpose of ADA preemption was to ensure that the States would not undo federal deregulation with regulation of their own.

By adopting the wording of the ADA preemption clause in the FAAAA, Congress also adopted the Supreme Court's broad preemption interpretation of the ADA. Like the ADA, the FAAAA was intended to help ensure transportation rates, routes, and services that reflect maximum reliance on competitive market forces, thereby stimulating efficiency, innovation, and low prices, as well as variety and quality.

Under the broad ADA/FAAAA preemption standard, a state law is preempted if it expressly references, or has a significant impact on, carriers' prices, routes, or services. A state law can be preempted even if its effect on prices, routes, or services is only indirect. Of course, there must be a limit to preemption because, in a broad sense, everything relates to everything else in some manner. Therefore, state laws that only have a tenuous, remote, or peripheral impact on prices, routes, or services are not preempted.

*DaSilva,* 2017 WL 58953, at **2–3 (internal quotation marks, modifications, citations and citations to quoted cases omitted).

In determining whether the FAAAA preempts an individual's claim for violation of state wage laws, the Court " 'must carefully evaluate even generally applicable state laws for an impermissible effect on carriers' prices, routes and services'  and 'engage with the real and logical effects of the state statute, rather than simply assigning it a label.' " *Id.* at *4 (quoting *Mass. Delivery Ass'n. v. Coakley*, 769 F.3d 11, 18 (1st Cir. 2014)(rejecting application of categorical approach exempting from preemption or finding preemption, over all generally applicable state labor laws). While addressing FAAAA preemption in regards to state wage laws, "[t]he First Circuit has held that a state law's potential impact on prices, routes, and services is sufficient for preemption if that impact is significant, rather than tenuous, remote, or peripheral.

The potential impact need not be proven by empirical evidence. 'Rather, courts may look to the logical effect that a particular scheme has on the delivery of services or the setting of rates.' " *DaSilva*, 2017 WL 58953, at * 3 (internal citation, citation to quoted case, and internal modification omitted).

In *Schwann v. FedEx Ground Package Sys., Inc*., 813 F.3d 429, 440 (1st Cir. 2016), a case involving delivery drivers suing FedEx for violation of the MWA, the First Circuit was asked to hold that the independent contractor provision's three prong test for determining an "employee" is preempted by the FAAAA. However, the First Circuit found that the only issue before it was preemption of the Prong 2[5]: The First Circuit evaluated Prong 2, found that it has the requisite impermissible effect on carriers and therefore, is preempted by the FAAAA. *DaSilva*, 2017 WL 58953, at *3 (after "appl[ying] the broad FAAAA preemption standard …, [the First Circuit] found Prong 2 to be preempted."). In support of his motion for partial summary judgment, Civil asserts that the FAAAA does not preempt *any* of the three prongs of the MWA's independent contractor provision-- however, he does not provide any legal analysis as to why the First Circuit's holding in *Schwann* (that Prong 2 is preempted) would not apply to this case. Instead, the sum total of Civil's legal argument on this issue is essentially that Spirit is unable to "carry its 'heavy burden' of demonstrating that 'Prong 2' is preempted." *See Pls' Mem. Of Law In Sup. Of Their Mot. For Partial Sum. J.* (Docket No. 113), at p. 8. Moreover, in his opposition to Spirit's motion for summary judgment, Civil seemingly concedes that based on the *Schwann* ruling, Prong 2 is preempted[6]. Under these circumstances, I find that Civil has waived

---

[5] While the district court in *Schwann* had held that Prongs 1 and 3 were preempted, the First Circuit did not address the issue after finding that the question of whether Prongs 1 and 3 were preempted had not been raised before the district court or on appeal. *See Schwann*, 813 F.3d at 441.

[6]   At the hearing on the parties' motions for summary judgment, Civil's counsel stated that in his briefs to the Court, he had been "opaque" as to whether Civil concedes that Prong 2 is preempted. Counsel was no clearer at the hearing: After essentially acknowledging that under First Circuit precedent Prong 2 is preempted, he then indicated that he wanted to preserve Civil's rights if *Schwann* is ever overturned

any argument to the contrary.  In any event, even assuming that Civil has not waived his

opposition regarding preemption of Prong 2, this issue requires little discussion:  the First

Circuit's ruling that Prong 2 is preempted by the FAAAA is binding in this case. *See DaSilva,*

2017 WL 58953, at \*4 (if state law is pre-empted as to one carrier, it preempted as to all carriers,

citing  *N.H. Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 72-73 (1st Cir. 2006), *aff'd,* 552 U.S.

364, 128 S.Ct. 989 (2008)).  Therefore, the Court will limit its discussion to whether Prongs 1

and 3 of the MWA's independent contractor provision are preempted by the FAAAA.[7]

In order to determine whether Prongs 1 and 3 are preempted, it is important to first

understand the First Circuit's reasons for finding preemption with respect to Prong 2.  Prong 2

provides that a worker is an employee under the MWA *unless* the worker preforms services that

outside employer's usual course of business.

> According to the First Circuit, Prong 2 was something of an anomaly in making
> any person who performs a service within the usual course of the enterprise's
> business an employee for state wage law purposes, even if those persons could be
> deemed independent contractors under federal law and the law of many states. As
> such, Prong 2 caused regulatory interference by precluding FedEx from providing
> for first-and-last mile pick-up and delivery services through an independent
> person who bears the economic risk associated with any inefficiencies in
> performance. That, the First Circuit reasoned, would have a significant effect on
> the carrier's routes and services as a matter of logic.

*Id.* (internal citations omitted).  Prong 1, on the other hand, provides that a worker can be

classified as an independent contractor if the employer does not control or direct the worker's

performance of his service. Under this prong, "the crux of the inquiry is in the *actual* relationship

between the parties, and whether the [worker] performs his work in fact 'with minimal

instruction.'  'The essence of the distinction under common law has always been the right to

control the details of the performance ... and the freedom from supervision not only as to the

---

[7] In *Chambers*, the SJC ruled that Prongs 1 and 3 are severable from Prong 2 and therefore, Civil's MWA claims survives unless they are also preempted. *Chambers,* 476 Mass. at 104-05, 65 N.E.3d 1.

result to be accomplished but also as to the means and methods that are to be utilized in the performance of the work.' "  *Ruggiero v. Am. United Life Ins. Co.*, 137 F. Supp.3d 104, 113 (D.Mass. 2015)(internal citation, citation to quoted case and internal quotation marks omitted). Prong 3 provides where a worker is customarily engaged in an independently established trade, occupation or business which is of the same nature of the services performed by the employer, then that worker may be an independent contractor. " 'The critical inquiry under this prong is whether the worker is capable of performing the service to anyone wishing to avail themselves of the services or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services.' In the case law, the line is drawn between the worker [who] is wearing the hat of an employee of the employing company and one who is wearing the hat of his own independent enterprise.' "  *Id.,* at 123–24 (citation to quoted case and internal quotation marks omitted).

The factors for satisfying both Prongs 1 and 3 are typical of the elements used to determine independent contractor status in many states and for purposes of federal law.  *See DaSilva*, 2017 WL 58593 at *4; *Chambers*, 476 Mass. at 106 n. 15, 65 N.E.3d 1. Therefore, they are less likely to have an effect on a carrier's pricing, routes and services. *Id.* ("state laws that are more or less nationally uniform, and therefore pose no patchwork problem, or that have less of a reference to and effect on a carrier's service and routes pose closer questions than the that presented in this case" quoting *Schwann*, 813 F.3d at 440).  It is true that to some extent Prong 1 limits the direction and control which an employer can maintain over a worker and still have him characterized as an independent contractor. However, the question is whether Prongs 1 and 3 have a *significant* restraint on the business model of an employer, like Spirit, such that the employer is compelled to abandon its independent contractor model all together.

16

Spirit asserts that because it is a broker not a motor carrier[8], like Prong 2, Prongs 1 and 3 of MWA's independent contractor statutory scheme have a significant impact on its business model.  More specifically, Spirit asserts that application of the MWA independent contractor provision could result in it being required to employ drivers and provide motor carrier services which it does not currently provide, nor is currently licensed to provide.

First, Spirit cites no legal authority in support of its assertions that if Civil, and similarly situated drivers, are found to be "employees" for purposes of the MWA, it status under the FAAAA would become that of a "carrier," which would have a significant impact on the way it is required to do business, *i.e.*, the services it provides and, consequently, its pricing.  Moreover, in assailing the affect that application of Prongs 1 and 3 would have on its business model (*i.e., its status as a broker, as opposed to carrier*), Spirit ignores the obvious— it can structure its agreements with drivers such as Civil to ensure that they are properly classified as "independent contractors" by: (1) limiting the control and direction maintained over the drivers' performance (both under the agreement and in fact), and (2) allowing the drivers/drivers' business to do delivery work outside of the work performed for Spirit and it customers. *Accord DaSilva*, 2017 WL 58953, at *4 (Prongs 1 and 3 still allow carrier to use independent contractor model so long as carrier does not exert a certain level of control over driver or prevent them from engaging in independently established trade).  Additionally, Spirit's argument regarding the affect Prongs 1 and 3 would have on its status as a "broker" for purposes of the FAAAA was made by the defendant in *DaSilva* and summarily rejected by Chief Judge Saris:

> Any application of the federal motor carrier statute to [defendant], however, would be by operation of the federal statutory definition of a motor carrier, and

---

[8] A broker is defined as "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2)

federal regulations that define the terms "employer" and "employee" for purposes of the federal motor carrier safety regulations … whether the plaintiffs fall within the definition is a matter of federal law, not state law.

*Id.*, at *5.  That leaves the more generic argument that Prongs 1 and 3 are preempted by the FAAAA because they significantly impact the delivery service industry.  Spirit argues that "empirical" evidence is not necessary to establish that FAAAA preemption is warranted, rather the courts must logically analyze the effect that application of the statutory scheme would have on the services at issue.  I agree. However, Spirit must still make more than conclusory allegations that a finding that Civil and other drivers are employees for purposes of the MWA would have a significant impact on its process, routes or services.

Outside of its allegations relating as to how application of Prongs 1 and 3 could affect is classification as a "broker" under the FAAAA (which I have previously rejected), Spirit asserts only that if claims are permitted to be brought pursuant to Prongs 1 and 3, its services would be significantly impacted because such claims would dictate those with whom it can contract. However, countrywide there have been a proliferation of state wage act claims against delivery carriers similar to the claims Civil asserts in this action. Almost uniformly, courts, including courts in this District, that have addressed this issue have found that state laws that define employees for purposes of state wage claims, such as Prongs 1 and 3, are not preempted by the FAAAA. *See Costello v. BeavEx, Inc.*, 810 F.3d 1045 (7th Cir. 2016)[9]; *Lupian v. Cory Holdings,*

---

[9] As part of the Illinois Wage Payment and Collection Act ("IWPCA"), the Illinois legislature enacted a three prong test for determining who is an "employee" which is substantially identical to the independent contractor provision of the MWA.  In *Costello*, the Seventh Circuit analyzing the IWPCA's three prong test, found that none of the prongs of the Illinois law were preempted, including, contrary to the First Circuits' subsequent holding in *Schwann*, the second prong. (*Costello* was decided before the First Circuit issued its decision in *Schwann*, however, the Seventh Circuit discussed the First Circuit's holding in *Massachusetts Delivery Ass'n v. Coakley*, 769 F.3d 11 (1st Cir. 2014), in which the Circuit telegraphed its *Schwann* holding that Prong 2 is preempted). While the Seventh Circuit acknowledged that the provisions governing the definition of who is an "employee" are substantially the same under Massachusetts and Illinois law, it also found that the "Massachusetts statute … triggers far more employment laws than the employment definition contained in the IWPCA." *Costello*, 810 F.3d at 1055. Since it affects more employment laws, the independent contractor provision of the MWA has more potential to affect the pricing, routes and services of carriers than does the equivalent IWPCA provision at issue in *Costello*. For that

*LLC.*, Civ. No. 2:16-05172, 2017 WL 896986 (D.N.J. Mar. 7, 2017); *DaSilva*, 2017 WL 58593;

*Portillo v. National Freight, Inc.*, Civ.Act.No. 15-7908, 2016 WL 5402215 (D.N.J. Sep. 26,

2016)(addressing claims brought under MWA: Prongs 1 and 3 are not preempted by the FAAAA

as their resolution does not have significant impact on prices, routes, or services to customers);

*Raposo v. Garelick Farms, LLC,* No. CIV.A. 11-11943-NMG, 2014 WL 2468815, at *4 (D.

Mass. June 2, 2014)(Massachusetts state and federal courts have uniformly rejected argument

that FAAAA preempts § 148B of the Wages Act, which governs whether worker is classified as

employee; they have reasoned that Congress did not intend to exempt motor carriers from

generally applicable state employment laws that have, at most, attenuated effect on prices and

services); *cf. Villalpando v. Exel Direct Inc.,* No. 12-cv-04137JCS, No. 13-cv-03091-JCS, 2014

WL 1338297, (N.D.Cal. Mar. 28, 2014)(claims brought under California law for violation of

statute requiring that employees be given meal and rest break claims were not preempted by

FAAAA: defendant's argument that it services would be diminished if it had to allow driver's

meal and rest breaks was tenuous— (1) defendant with only moderate effect on pricing could

increase workforce and equipment to compensate for lost time while keeping same business

model, and (2) requiring defendant to provide its drivers with meal and rest breaks would not

have significant impact on defendant's routes).

 In finding that state wage law claims are not preempted by the FAAAA, the courts are

often persuaded by the fact that enacting statutory schemes that protect workers, such as wage

laws, are traditionally within the police powers of the state and that while many rules and

regulations applicable to carriers affect their price, routes and services, such impact is generally

tenuous and does not require the carriers to change their business model. The independent

---

reason, the Seventh Circuit's holding, while informative, is less persuasive than it would be if Illinois employment laws more closely aligned with Massachusetts employment laws.

contractor provision of the MWA was enacted by the Massachusetts legislature to grant eligible workers "employee" status thereby giving them the benefits and rights of employees. *See Chambers*, 476 Mass. at 100, 65 N.E.3d 1.  In this case, Spirit has failed to convince the Court that application of Prongs 1 and 3 of that provision would have any impact on its routes, or that any impact on its pricing or services would be more than tenuous. Therefore, I find that Prongs 1 and 3 are not preempted by the FAAAA.

### *Whether Summary Judgment Should Enter on Civil's Equitable Claims*

Spirit also asserts that Civil's unjust enrichment claim is preempted by the FAAAA.  In the alternative, Spirit asserts that it is entitled to summary judgment on this claim and on Civil's equitable claim for quantum meruit because he has an adequate remedy at law.  Civil did not oppose Spirit's motion for summary judgment on Counts II and III in his opposition and at the hearing did not argue against judgment entering on these claims.  In any event, I have found that Prongs 1 and 3 of independent contractor provision of the MWA are not preempted by the FAAAA and therefore, Civil has an adequate remedy at law. For these reasons, Spirit's motion for summary judgment is allowed with respect to Civil's equitable claims for unjust enrichment and quantum meruit.

### Whether Civil is Entitled to Partial Summary Judgment

Civil asserts that based on the record before the Court, the undisputed facts establish as a matter of law that he is an "employee" of Spirit for purposes of the MWA.  *See Ruggiero*, 137 F. Supp. 3d at 113 ("Whether the defendant has carried its burden under § 148B(a)—on facts that are undisputed—is a question of law"). I disagree. With respect to Prong 3, there are clearly material issues of fact as to whether during the course of his business relationship with Spirit Civil was capable of performing delivery services for non-Spirit customers. It is a much closer

case as to whether Spirit can satisfy Prong 1 of the independent contractor provision.  In order to

satisfy Prong 1, Spirit must show that Civil is free from control and direction in connection the

performance of the service he performed--  bearing in mind that the provision is not read so

narrowly as to require the worker to be *entirely* free from direction and control.  Civil has

asserted facts, which, if undisputed, would establish that Spirit not only exercised a high degree

of direction and control over him, it micromanaged almost every aspect of his performance.

Spirit, on the other hand, has put just enough material facts in dispute to preclude a finding that

as a matter of law, it cannot satisfy Prong 1. More specifically, Spirit has rebutted Civil's

contention that it controlled when he was required to show up,  how is truck was loaded, who

determined the route he followed and the order in which deliveries were made.  While I am

inclined to find that the facts largely support a finding that the degree of control Spirit exercised

over Civil was such that he is an "employee" for purposes of the MWA, there are genuine issues

of material fact which are best decided by a jury. Therefore, Civil's motion for partial summary

judgment is denied.

### Civil's Motion For Class Certification

Civil seeks class certification of his state law claims pursuant to Fed.R.Civ.P. 23. In a

Rule 23 class action, each individual/entity who falls within the definition of the class is deemed

a class member and is bound by any final judgment (favorable or not), unless s/he has opted out

of the class.  The surviving count of the Amended Complaint (Count I) asserts a claim for

violation of the independent contractor provision of the MWA.  Civil seeks to certify as a class:

> All individuals who signed Settlement Carrier Contracts with Spirit, in either their
> individual capacities or through personal corporate entities, and who personally
> provided Massachusetts based delivery services for Spirit at any time between
> June 28, 2010 and the present.

Civil also seeks to be appointed as class representative and to have Lichten & Liss-Riordan, P.C. appointed as class counsel.

### Rule 23(a) Requirements

A proposed class under Rule 23(a) must meet the following four requirements:  "(1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy). The plaintiffs have the burden of showing that all the prerequisites for a class action have been met." *Garcia v. E.J. Amusements of New Hampshire, Inc.*, 98 F.Supp.3d 277, 284–85 (D. Mass. 2015)(internal citations omitted).  In this case, Spirit disputes only whether the second (commonality), third (typicality) and fourth (adequacy) requirements have been met. Nevertheless, because the law charges the Court with " 'conduct[ing] a rigorous analysis of the prerequisites established by Rule 23 before certifying a class' ", *see id.* at 285 (citation to quoted case omitted),  I will independently analyze whether all requirements have been met.

### Number of Class Members (Numerosity)

To be certified as a class under Rule 23, the number of members must so numerous that joinder of all would be "impracticable."  " 'No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.' " *Id.*, (citation to quoted case omitted).  In this case, Civil asserts that based on Spirit's own records, it entered into approximately 19-60 Carrier Agreements *per year*, during the relevant class period. Accordingly, Civil estimates that the class is well over sixty drivers—a contention that is not

challenged by Spirit and which is borne out by the record.   Therefore, Civil comfortably meets the numerosity requirement. *See DeRosa v. Massachusetts Bay Comm. Rail Co.*, 694 F.Supp.2d 87, 98 (D.Mass. 2010)(classes of forty or more have been found sufficient to meet numerosity requirement).

*Commonality of Facts and Law*

*R*ule 23 requires that there be questions of law or fact common to the class. More specifically, "the class claims must depend upon a 'common contention' that is 'capable of class wide resolution-which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.' In other words, the commonality requirement is met where the 'questions that go to the heart of the elements of the cause of action' will 'each be answered either 'yes' or 'no' for the entire class' and 'the answers will not vary by individual class member.' " *Garciaare* , 98 F.Supp.3d. at 285 (Internal citations and citation to quoted case omitted).  In this case, Civil alleges that Spirit improperly classified its drivers as independent contractors when they were actually "employees" for purposes of the MWA. As a consequence, Spirit has allegedly violated the MWA by subjecting Civil and other similarly situated individuals to improper deductions from their compensation checks and shifting expenses to the drivers.

Civil asserts that the class is defined by the common legal question of the drivers' employment status, that is, whether Spirit has misclassified him and other delivery drivers as independent contractors in violation of the independent contractor provision of the MWA. Civil also asserts that the employment status of proposed class members can be resolved through common evidence.  He argues that Spirit's ability to meet its burden to satisfy Prongs 1 and 3 of the MWA's independent contractor provision will turn on "class wide" evidence regarding its

practices and policies rather than on evidence regarding delivery drivers' actions and

circumstances.   Civil then argues that if it is determined that the drivers were employees of

Spirit (based on such common evidence), then Spirit's deductions and expense shifting clearly

violate the MWA. This is true to some extent. However, as argued by Spirit, given its business

model, there remains the possibility that individualized inquiry will be required which could be

burdensome. For example, Civil Delivery had been incorporated and done work for other entities

prior to signing the Carrier Agreement and continued to exist after the relationship with Spirit

ended.  Spirit asserts that there are other drivers who, like Civil, had corporations in place before

entering into a relationship with it and whose corporations continued as viable entities after

terminating the relationship with Spirit. There are allegations that other drivers created

corporations for the sole purpose of working with Spirit and that after the relationship ended,

some of those corporations continued in the delivery business and others did not. Further, this

rubric appears to be a common method of securing carrier service. Additionally, Civil has failed

to include any analyses of the nature of the deductions taken from the drivers or expenses

shifted, *i.e.*, were the same deductions taken and expenses shifted with respect to all drivers?

Moreover, will the fact that different drivers worked for different Spirit customers, each of which

imposed their own standards and requirements, make it more difficult to resolve these issues on a

class wide basis?

Given that the record before me shows that drivers worked for different Spirit customers

who set their own standards and requirements, it remains an open question as to whether

individualized scrutiny will be required as to each class member both on the issue of whether

they were "employees" and, if they were, the extent to which Spirit is liable to them.  At the

same time it appears that answers to such inquiries should be readily ascertainable through a

common source-- Spirit's corporate records.  Moreover, given the nature of the allegations, the issue of when/if the drivers created corporate entities and whether those corporate entities continued to exist after the relationship with Spirit ended is ultimately of minimal relevance to the proposed classes' MWA claim and should not require a significant amount of individualized evidence: the primary issues will be how much control Spirits exercised over the drivers/corporate entities and whether under the terms of the Carrier Agreement *and*, in practice, such drivers/corporate entities had the right to avail themselves of other jobs while working for Spirit. *See* note 3, *supra.*  Under the circumstances, the Court finds that Civil's allegation that Spirit's system wide policy of mischaracterizing its drivers as independent contractors in violation of the MWA satisfies the commonality requirement.

Typicality and Adequacy

 "Typicality," as the term suggests, requires that the claims of the representative plaintiff be typical of the claims of the class.  The typicality requirement is met "when [the representative plaintiff's] injuries arise from the same events or course of conduct as do the injuries of the class and when plaintiff[s'] claims and those of the class are based on the same legal theory." *In re Credit Suisse-AOL Sec. Litig*, 253 F.R.D. 17, 23 (D.Mass. 2008).  This does not mean that the representative plaintiff's claims must be identical to those of proposed class members, rather the " 'question [is] whether the putative class representatives can fairly and adequately pursue the interests of the [proposed] class members without being sidetracked by their own particular concerns.' " *Id.* (citation to quoted case omitted).

The "Adequacy" requirement "demands a similar inquiry into whether the putative representative plaintiff's interests are aligned with other class members and whether the plaintiff is in a position to vigorously protect the class' interests …. The analyses has two steps:  The

Court must determine, 'first, whether any potential conflicts exist between the named plaintiffs and the prospective class members, and, second, whether the named plaintiffs and their counsel will prosecute their case vigorously.  Both typicality and adequacy may be defeated where the class representatives are subject to unique defenses which threaten to become the focus of the litigation' " *Id.* (citation to quoted case omitted).

In this case, Spirit asserts that Civil's claims are not typical of the claims of the proposed class.  More specifically, Spirit argues that the corporate status of the various class members who contracted with it and the presence of some contracts with individuals and absence of contract with others destroys any possibility of a finding that Civil's claims are typical of the proposed classes' claims.  Essentially, Spirit's arguments with regard to typicality mirror its argument with respect to commonality: individual inquiry will be required to as a result of the differing corporate status of the proposed class members, for example, to determine whether the corporate structure of each proposed class member's company was legitimate. I disagree and find that Civil's alleged injuries arise from the same events and course of conduct as those of the proposed class members.

Spirit also challenges whether Civil satisfies the adequacy requirement.  More specifically, Spirit essentially argues that Civil lacks the integrity to represent the class because he failed to provide complete personal and corporate tax returns relating to the services performed for Spirit.  I am troubled by Civil's failure to provide un-redacted, complete tax records given that his corporation existed prior entering a relationship with Spirit and apparently employed other individuals. It is likely that at trial, issues will be raised concerning Civil Delivery's employment of other individuals and how it treated them for tax purposes. How Civil Delivery characterized compensation received from Spirit on his individual and corporate tax

returns may also be issues addressed during the course of the trial.  Nevertheless, I do not *at this time* find that such conduct makes Civil inadequate to represent the interests of the class.  *Cf. Randle v. Spectran*, 129 F.R.D. 386. 392 (D.Mass. 1988)(putative class representative's failure to file tax returns, while serious, is not so conclusive as to individual's honesty or capacity for truthfulness to compel conclusion that he cannot adequately represent class).   As to the second prong of the adequacy determination, *i.e.*, whether Civil and his counsel will vigorously prosecute the case, I am satisfied that they will do so. I am also satisfied that Civil's counsel has demonstrated that they are qualified, experienced and are also fully prepared to represent the class to the best of their abilities.  Accordingly, I find that they typicality and adequacy requirements are met.

I find that all of the Rule 23(a) requirements are met and therefore, that class certification thereunder is appropriate. However, in order to obtain class certification, Civil must also establish that the action may be maintained under Fed.R.Civ.P. 23(b)(1),(2) or (3). *See* Fed.R.Civ.P. 23(b); *Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 38 (2003).

Rule 23(b)(3) Certification

Civil also asserts that he has satisfied Rule 23(b)(3), which requires, in relevant part that:

> the Court find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

*Id.*  The factors to be considered by the Court in making this finding include:

> **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;

> **(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;

> **(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

27

           **(D)** the likely difficulties in managing a class action.

*Id.*

In order to establish predominance, the putative class representative must show that the proposed class is " 'sufficiently cohesive to warrant adjudication by representation.' " "While 'the predominance criterion is far more demanding' than the commonality requirement, it presumes that individual issues will exist. The heart of the predominance inquiry is whether the 'uncommon questions,' outweigh the commonalities. 'Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class.' Put another way, there must be a 'sufficient constellation of common issues bind[ing] class members together....' " *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 28 (D. Mass. 2010)(internal citations and citation to quoted cases omitted). In this case, I am satisfied that common issues predominate. Moreover, the proposed relief, in the form of monetary damages, is common to all class members. As discussed, there may be some individual issues, however, these uncommon issues do not outweigh the common ones.  Therefore, on the whole, common issues predominate.

"Superiority exists where 'there is a real question whether the putative class members could sensibly litigate on their own for these amounts of damages, especially with the prospect of expert testimony required.' " *Id.*, at 29 (citation to quoted case omitted). While class members probably could litigate the claims on their own, given that some class members worked for Spirit only for a limited period and are likely to recover a minimal amount, pursuing individual claims would be impractical. Moreover, as pointed out by Civil, multiple actions would result in increased expense for the parties and the Court as the result of duplicative discovery, multiple court proceeding, etc.  While I do not necessarily find the argument compelling, I also give some weight to Civil's assertion that in the employment context, individual's decline to bring suit because of the fear of retaliation.

I agree with Civil that it will be far more efficient and economical, both to the class members and the Court, for this matter to be pursued as a class action rather than a series of individual suits. Accordingly, I find that this matter may be maintained as a class action under Rule 23.

Certification Procedure

1. On or before April 7, 2017, Civil shall provide the Court with a proposed class certification Order defining the class[10], the class claims, issues, or defenses, and appointing class counsel under Fed.R.Civ.P. 23(g).  Civil shall also file a proposed form of notice in accordance with Fed.R.Civ.P. 23(c)(2)(B).  If Spirit objects to the proposed Order and/or form of notice, it shall file its own proposed Order/form of notice by April 14, 2017.[11]

2. Spirit is ordered to produce to Civil by April 12, 2017, the list of names and current or last known mailing and e-mail addresses and telephone numbers of the individual and/or entities that may belong to the collective action.

**Conclusion**

1. Plaintiffs' Motion For Class Certification (Docket No. 59) is ***granted***;

2. Defendant's Motion for Summary Judgment (Docket No. 108) is ***granted***, in part, and ***denied***, in part, as provided in this Memorandum of Decision and Order; and

3. Plaintiffs' Motion for Partial Summary Judgment (Docket No. 112) is ***denied***.

**SO ORDERED.**

> ***/s/ Timothy S. Hillman***
> TIMOTHY S. HILLMAN
> UNITED STATES DISTRICT JUDGE

---

[10] To be clear, the class would include drivers such as Civil who individually contracted with Spirit or whose corporations contracted with Spirit-- the class should not include secondary workers hired by them.

[11] Notwithstanding the procedure outlined by the Court, the parties are encouraged to confer and file a joint proposed Order and form of notice under Rule 23 on or before April 7, 2017.